UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

RAHEEM J. BRENNERMAN,

Defendant.

Case. No. 17 Cr. 337 (RJS)

ECF Case

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT,
SUPPRESS EVIDENCE, AND FOR RETURN OF SEIZED PROPERTY**



Maranda E. Fritz
Brian D. Waller
Thompson Hine LLP
335 Madison Avenue, 12th Floor
New York, New York 10017
Telephone: (212) 344-5680

*Attorneys for Raheem Brennerman*

4835-6904-0719

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

POINT I     EACH and EVERY COUNT CHARGED IS DEFECTIVE AND THE
            INDICTMENT SHOULD BE DISMISSED ...................................... 4

   A.   The Alleged Bank Fraud is Unsupported by the Evidence...................................... 4

   B.   The Alleged Wire Fraud Occurred Almost Exclusively Abroad........................... 5

   C.   The Alleged Immigration Fraud Occurred Outside of the
        Southern District of New York ................................................................... 8

POINT II    THE DEVICES SEIZED PURSUANT TO THE SEARCH WARRANT
            SHOULD BE RETURNED AND THE SEIZED MATERIALS
            SUPPRESSED OR NONRESPONSIVE MATERIAL RETURNED............. 9

   A.   The Warrant Failed to Articulate Probable Cause for Seizure of
        Mr. Brennerman's Records.......................................................................... 9

   B.   The Government's Execution of the Warrants was Unconstitutional ................. 18

POINT III   THE COURT SHOULD ORDER THE GOVERNMENT TO
            IMMEDIATELY DISCLOSE RULE 404(B) EVIDENCE .......................... 20

CONCLUSION .................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*European Cmty. v. RJR Nabisco, Inc.*,
   764 F.3d 129 (2d Cir. 2014)..................................................................................5, 6

*Frontpoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   No. 16 Civ. 5263 (AKH), 2017 U.S. Dist. LEXIS 132759 (S.D.N.Y. Aug. 18,
   2017) ........................................................................................................................7

*ICBC (London) Plc v. The Blacksands Pacific Group, Inc.*,
   1:15-cv-00070-LAK (S.D.N.Y.) ...........................................................................2, 9

*Microsoft Corp. v. AT & T Corp.*,
   550 U.S. 437 (2007)..................................................................................................8

*Morrison v. Nat'l Austrl. Bank Ltd.*,
   561 U.S. 247 (2010)........................................................................................1, 6, 7

*Petroleos Mexicanos v. SK Eng'g & Const. Co.*,
   572 F. App'x 60 (2d Cir. 2014) ...............................................................................6

*RJR Nabisco, Inc. v. European Cmty.*,
   136 S. Ct. 2090 (2016).................................................................................. *passim*

*SEC v. Tourre*,
   No. 10 Civ. 3229 (KBF), 2012 U.S. Dist. LEXIS 165214
   (S.D.N.Y. Nov. 19, 2012) .........................................................................................7

*Sullivan v. Barclays PLC*,
   No. 13-cv-2811 (PKC), 2017 U.S. Dist. LEXIS 25756
   (S.D.N.Y. Feb. 21, 2017) .......................................................................................6, 7

*United States v. Abdellatif*,
   758 F. Supp. 2d 183 (W.D.N.Y. 2010), *adopted by, motion granted by, in
   part, motion denied by, in part,* 758 F. Supp. 2d 183 (W.D.N.Y. 2010) ................15

*United States v. Al Kassar*,
   660 F.3d 108 (2d Cir. 2011).....................................................................................8

*United States v. Barnes*,
   49 F.3d 1144 (6th Cir. 1995) ..................................................................................21

*United States v. Barrett*,
   178 F.3d 643 (2d Cir. 1999).....................................................................................4

*United States v. Bezmalinovic*,
    962 F. Supp. 435 (S.D.N.Y. 1997) ...................................................................6

*United States v. Bouchard*,
    828 F.3d 116 (2d Cir. 2016)..........................................................................4

*United States v. Bowen*,
    689 F. Supp. 2d 675 (S.D.N.Y. 2010)..........................................................15

*United States v. Caruso*,
    948 F. Supp. 382 (D.N.J. 1996) ..................................................................22

*United States v. Cioffi*,
    668 F. Supp. 2d 385 (E.D.N.Y. 2009) ....................................................15, 16

*United States v. Comprehensive Drug Testing, Inc.*,
    621 F.3d 1162 (9th Cir. 2010) ....................................................................14

*United States vs. Criminal Triumph Capital Grp.*,
    211 F.R.D. 31, 60 (D. Conn. 2002)..........................................................18, 19

*United States v. Dupree*,
    781 F. Supp. 2d 115 (E.D.N.Y. 2011), *motion granted by, in part, motion
    denied by, in part*, 2011 U.S. Dist. LEXIS 55159 (E.D.N.Y. May 23, 2011) ........19

*United States v. Galpin*,
    720 F.3d 436 (2d Cir. 2013)....................................................................12, 15

*United States v. Graziano*,
    558 F. Supp. 2d 304 (E.D.N.Y. 2008), *aff'd*, 2010 U.S. App. LEXIS 18768
    (2d Cir. Sept. 7, 2010)................................................................................19

*United States v. Grimmett*,
    439 F.3d 1263 (10th Cir. 2000) ..................................................................18

*United States v. Hawit*,
    No. 15-cr-252 (PKC), 2017 U.S. Dist. LEXIS 23391 (E.D.N.Y. Feb. 17, 2017)....................6

*United States v. Heatley*,
    994 F. Supp. 483 (S.D.N.Y. 1998) ..............................................................22

*United States v. Kernell*,
    No. 3:08-cr-142, 2010 U.S. Dist. LEXIS 32845 (E.D. Tenn. Mar. 31, 2010),
    *Report and Recommendation adopted by*, 2010 U.S. Dist. LEXIS 36292 (E.D.
    Tenn. Apr. 13, 2010)..................................................................................18

*United States v. Liu*,
    239 F.3d 138 (2d Cir. 2000)........................................................................18

*United States v. Livoti*,
     8 F. Supp. 2d 246 (S.D.N.Y. 1998) ...................................................................22

*United States v. Mutschelknaus*,
     564 F. Supp. 2d 1072 (D. N.D. 2008), *aff'd*, 592 F.3d 826 (8th Cir. 2010) ............................19

*United States v. Ramirez*,
     420 F.3d 134 (2d Cir. 2005)...........................................................................8

*United States v. Rodriguez*,
     140 F.3d 163 (2d Cir. 1998)............................................................................5

*United States v. Sidorenko*,
     102 F. Supp. 3d 1124 (N.D. Cal. 2015) .................................................................8

*United States v. Soliman*,
     No. 06-cr-236, 2008 U.S. Dist. LEXIS 87304 (W.D.N.Y. Oct. 29, 2008) ............................18

*United States v. Squillacote*,
     221 F.3d 542 (4th Cir. 2000) ..........................................................................18

*United States v. Tamura*,
     694 F.2d 591 (9th Cir. 1982) ....................................................................17, 18

*United States v. Ulbricht*,
     858 F.3d 71 (2d Cir. 2017)............................................................................14

*United States v. Upham*,
     168 F.3d 532 (1st Cir. 1999) ..........................................................................18

*United States v. Wey*,
     No. 15-cr-611(AJN), 2017 U.S. Dist. LEXIS 91138
     (S.D.N.Y. June 13, 2017)............................................................... *passim*

**Statutes**

18 U.S.C. § 20.................................................................................................4

18 U.S.C. § 1343.............................................................................................6

18 U.S.C. § 1344.............................................................................................4

RICO ...........................................................................................................6

Fourth Amendment .........................................................................3, 12, 19

**Rules**

Fed. R. Crim. P. 41(e)(2)(B) Commentary ......................................................................18

Fed. R. Evid. 404(b)............................................................................................20, 21, 22

## PRELIMINARY STATEMENT

This memorandum is submitted in support of defendant's motions for dismissal of the indictment and return and/or suppression of materials seized from the home and the person of Raheem Brennerman.  The indictment should be dismissed because: (i) this Court lacks jurisdiction over Count 2, the bank fraud count; (ii) Count 3, the wire fraud count pertains only to extraterritorial conduct and is therefore improper under *Morrison* and *RJR Reynolds*; and (iii) venue is improper for Count 4, the visa fraud count.[1]  Further, the material seized under the search warrant should be suppressed, and those seized materials should be returned to Mr. Brennerman.

As discussed below, the bank fraud count is improperly premised on alleged misrepresentations made by Mr. Brennerman to "Bank 1," which is, in fact, ICBC (London) Plc ("ICBC London").[2]  But ICBC London is a British bank that is indisputably not FDIC insured, and so the federal bank fraud statute does not apply.  Similarly, the wire fraud count is an improper extraterritorial application of that statute.  Under the Supreme Court decisions in *Morrison* and *RJR Nabisco*, the government is precluded from employing the wire fraud statute in relation to conduct that occurred outside of the United States.  Here, ICBC London is located outside of the United States, as were all of Mr. Brennerman's negotiations with that bank in connection with the loan transaction that serves as the predicate conduct for the wire fraud count.  While the  indictment also included vague references to Mr. Brennerman's dealings with other banks, these claims fail for a more obvious reason:  Mr. Brennerman never sought or received

---

[1]  Count 1, the conspiracy to commit bank fraud and wire fraud count, should also be dismissed because it is premised on the conduct underlying the improper substantive counts.

[2]  As detailed *infra*, the affidavit supporting the government's search warrant refers to a loan from "ICBC (USA) N.A." ("ICBC USA"), which is incorrect.  There was no loan that originated from, and no negotiations that took place with, ICBC USA, as demonstrated by the lengthy litigation filed by ICBC London to obtain repayment from Blacksands.

any financing from those entities and did not ever attempt to commit any fraud. Finally, venue is improper for the visa fraud count, as no alleged conduct related to any element of that statute occurred in the Southern District of New York.

With respect to the seized materials, those should be suppressed on two distinct grounds: first, the affidavit submitted in support of the warrant fails to establish probable cause to support issuance of the expansive search warrant. In addition, the warrant is overbroad to the point of constituting nothing but an exploration of literally all of Mr. Brennerman's transactions to try to find some impropriety. Further, the government engaged in a blatant overseizure of all of Mr. Brennerman's personal files and electronic information and must be required to return the devices and complete the execution of the warrant within a reasonable time frame or return all seized materials.

The deficiencies in the warrant application appear to stem from the apparent lack of any meaningful investigation that preceded it. This case was never investigated by these prosecutors or by the Federal Bureau of Investigation and so was never properly vetted or scrutinized.[3] The matter was referred to the United States Attorney's Office ("USAO") by Judge Kaplan and, when the prosecutors filed a fairly run of the mill petition, the district court communicated at high volume that it wanted the matter to be handled more aggressively. These prosecutors then hurriedly decided to adopt the completely unsubstantiated and unpersuasive claims of supposed fraud that had been leveled by the plaintiff in the civil case. *See ICBC (London) Plc v. The Blacksands Pacific Group, Inc.*, 1:15:cv-00070-LAK (S.D.N.Y.) (the "Civil Case"). The warrant application, therefore, parrots the claims from the Civil Case and then seeks, on that basis,

---

[3] Notably, the government's document production reflects that these same issues were actually investigated by federal authorities in California in 2014. After execution of warrants and subpoenas and review of documents, ***no charges were filed***.

2

authorization to seize literally *all* of Mr. Brennerman's documents relating to any oil and gas related business venture, evidence "concerning the operation of Blacksands Pacific Group, Inc. and its subsidiaries and affiliates," and evidence concerning any payments, credit cards or other receipt or transfer of assets – all completely unlimited in time.  Declaration of Brian D. Waller in Support of Motion to Dismiss and Motion to Suppress, dated September 19, 2017 ("Waller Decl.") Ex. 2, Search Warrant ¶¶ 2, 3, 4, 9.  The assertions of that plaintiff, ICBC London, did not even support a warrant to seize documents related to that ICBC London transaction, much less seizure of every shred of someone's business dealings.

To make matters worse, the government then decided to engage in an overseizure of staggering proportions.  It literally took from his *home* every one of Mr. Brennerman's electronic devices and all of his papers – seizing the entire universe of his correspondence and files relating to any and all personal, family, business, medical and financial issues.  Having decided to proceed by way of massive overseizures, the government must then promptly conduct an appropriate forensic analysis in order to identify those files that were within the scope of the warrant. And to this point, there is absolutely no evidence that the government has properly processed that data to identify that which is responsive.  It therefore appears that the government has failed to execute the warrant in a manner that is consistent even with its overbroad terms, much less one that is reasonable under the Fourth Amendment.

## STATEMENT OF FACTS

The relevant facts are included in the Declaration of Brian D. Waller filed concurrently herewith.

<u>POINT I</u>

**EACH and EVERY COUNT CHARGED IS DEFECTIVE AND THE INDICTMENT
<u>SHOULD BE DISMISSED</u>**

**A.     The Alleged Bank Fraud is Unsupported by the Evidence**

No charge of bank fraud under 18 U.S.C. § 1344 lies in this case.  The only allegations of

an actual application for or receipt of financing concern the bridge loan involving ICBC London

(referred to in the indictment as Bank 1).  Waller Decl. Ex. 1 (Indictment "Ind.") at ¶¶ 13-14.

But the elements of the charged offense require that the bank be insured by the Federal Deposit

Insurance Corporation ("FDIC")[4] —and ICBC London plainly is not.  While the indictment

appears to allege that ICBC London is FDIC insured, as it is the only bank specifically referred

to in the indictment, that allegation is plainly false.  ICBC London is a British bank that is

indisputably not FDIC insured.  *United States v. Bouchard*, 828 F.3d 116, 125 (2d Cir. 2016)

("[A] defendant cannot be convicted of violating § 1344(1) merely because he intends to defraud

an entity . . . that is not in fact covered by the statute.").

Furthermore, the indictment fails to allege that any of the supposed misrepresentations

made to ICBC London—such as the locations of Blacksands' offices or the number of

employees it had—occurred prior to or materially induced ICBC London to enter into the

transaction with Blacksands.  Waller Decl. Ex. 1.  Even according to the government, those

alleged misrepresentations were made at a meeting with ICBC London that occurred in London

in May 2014, six months *after* the bridge loan ICBC London gave Blacksands was finalized and

funded.  Waller Decl. Ex. 2 Ellard Aff. ¶ 16(h).  It was in those meetings – and not in any

application for the loan – that Mr. Brennerman allegedly made false statements concerning

---

[4] "The well established elements of the crime of bank fraud are that the defendant (1) engaged in a course of
conduct designed to deceive a federally chartered or insured financial institution into releasing property; and (2)
possessed an intent to victimize the institution by exposing it to actual or potential loss."  *United States v. Barrett*,
178 F.3d 643, 647-48 (2d Cir. 1999); *see also* 18 U.S.C. § 20 (defining "financial institution").

Blacksands.  *Id.*  Thus, the government folded post-loan claims into its argument that Mr. Brennerman made actionable false statements to ICBC London to procure the loan.  The government cannot point to even one misrepresentation that was made to induce ICBC London to enter into the bridge loan.  Without such evidence, there can be no violation of the bank fraud statute.  *See United States v. Rodriguez*, 140 F.3d 163, 167-68 (2d Cir. 1998) (reversing bank fraud conviction where evidence failed to demonstrate that any of defendant's misrepresentations would have affected the bank's actions).

Furthermore, the indictment does not allege that the transaction for which Blacksands sought funding was in any way fraudulent.  And the indictment ignores the fact that Blacksands provided voluminous substantive information to ICBC London before it made the loan to Blacksands.  Waller Decl. Ex. 4 (Hearing Transcript before The Honorable Richard J. Sullivan, dated June 1, 2017).  Thus, the government incredibly suggests that Blacksands asked for the loan, and ICBC London, without review of documentation or due diligence of any kind, disbursed more than $4 million to Blacksands.  *Id.*  These allegations are plainly insufficient to support the bank fraud.

### B.     The Alleged Wire Fraud Occurred Almost Exclusively Abroad

The government's amalgam of allegations in its wire fraud charge, on the one hand, are plainly deficient and, on the other hand, bear no connection to the United States and should therefore be dismissed.  The government has tossed into a single count vague references to unrelated and disparate contacts with "other financial institutions", but there are no allegations of actionable fraud with regard to those.  (Ind. ¶ 7).  The only potentially actionable transaction – the one with ICBC London – occurred entirely outside the United States and is not properly the subject of the wire fraud statute.

The wire fraud statute does not apply extraterritorially. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2105-06 (2016) (citing *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 139-40 (2d Cir. 2014)); *Morrison v. Nat'l Austrl. Bank Ltd.*, 561 U.S. 247, 265 (2010) (rejecting extraterritorial application of statute where no evidence it was intended to apply outside of domestic transactions); *United States v. Hawit*, No. 15-cr-252 (PKC), 2017 U.S. Dist. LEXIS 23391, at *12 (E.D.N.Y. Feb. 17, 2017) ("the federal wire fraud statute, 18 U.S.C. § 1343, does not apply extraterritorially"); *cf. Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (holding that "wire fraud cannot serve as such an extraterritorial predicate" for RICO claims). A complaint alleges a domestic violation of the wire fraud statute only if it "'alleges conduct in the United States that satisfies every essential element'" of the wire fraud statute. *RJR Nabisco*, 136 S. Ct. at 2105 (quoting *European Cmty.*, 764 F.3d at 142).

Here, all salient allegations in the indictment pertain to ICBC London, which is a London bank (and a subsidiary of a Chinese bank). Waller Decl. Ex. 1. There are no allegations that any of that alleged criminal conduct took place in the United States. In fact, it is well documented that all of the allegedly fraudulent negotiations and representations occurred outside of the United States.[5] Indeed, the indictment does not allege that Mr. Brennerman ever attempted to defraud anyone in the United States. *Id.* The government's allegations depict a foreign defendant who negotiated in London with a London-based subsidiary of a Chinese bank—an entity that Judge Kaplan recently confirmed is "a foreign bank located approximately 3,500 miles from the courthouse" and not subject to issuance of a subpoena. Waller Decl. Ex. 8 at 3.

---

[5]  As noted *supra*, Mr. Ellard's affidavit in support of the search warrant (but not the indictment) references a communication between ICBC London and ICBC New York. Ellard Aff. ¶ 16(c). Mr. Brennerman was not involved in that communication and ICBC (USA) did not participate in the transaction. In any event, preparatory or ministerial acts are insufficient to establish venue for these charges. *See, e.g.*, *United States v. Bezmalinovic*, 962 F. Supp. 435, 441 (S.D.N.Y. 1997) (concluding that venue for a charge of bank fraud did not lie in the Southern District when the only acts that occurred there were ministerial ones not intended or foreseen by the defendant).

The allegations here demonstrate even less of a connection to the United States than those used to support a wire fraud claim in *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 U.S. Dist. LEXIS 25756, at *97-102 (S.D.N.Y. Feb. 21, 2017).  In *Sullivan*, the complaint made "generalized allegations about the defendants' use of interstate wires to coordinate a [foreign-based] scheme," as well as other allegations that are absent from this case, such as phone calls involving domestic participants.  *Id.* at *100.  The *Sullivan* court dismissed the wire fraud charge on jurisdictional grounds, holding that the allegations did not "plausibly allege that any acts of wire fraud were *primarily* domestic in nature," and emphasizing that virtually all of the conduct at issue occurred in Europe, not the United States.  *Id.* (emphasis added).  The same is true here: even assuming *arguendo* that the indictment adequately alleges wrongful conduct, any act of wire fraud committed in furtherance of the conspiracy was not sufficiently domestic as to overcome the presumption against extraterritoriality.  *See id.*; *see also Frontpoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263 (AKH), 2017 U.S. Dist. LEXIS 132759, at *47 (S.D.N.Y. Aug. 18, 2017); *SEC v. Tourre*, No. 10 Civ. 3229 (KBF), 2012 U.S. Dist. LEXIS 165214, at *22 (S.D.N.Y. Nov. 19, 2012) ("[B]ecause the ABACUS Trustee-to-Goldman transfer of title is . . . the only domestic transaction that occurred, and because the fraud was perpetrated upon IKB/Lorely—not on Goldman, there is no fraudulent U.S.-based transfer of title 'in connection with' the IKB note purchase sufficient to sustain a section 10(b) or Rule 10b-5 claim against Tourre" and jurisdiction in New York was, therefore, lacking) (citation omitted).

    This matter is analogous to what Justice Breyer called "foreign-cubed" litigation, "cases where the plaintiffs are foreign, the defendants are foreign, and all the relevant conduct occurred

abroad."[6]  *RJR Nabisco*, 136 S. Ct. at 2116 (Breyer, J. dissenting to Part IV) (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, n.11 (2010) (Stevens, J. concurring in judgment)).  The charge of wire fraud, predicated on activity in London, should be dismissed.  *RJR Nabisco*, 136 S. Ct. at 2100 (citing *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007)); *accord United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1131-32 (N.D. Cal. 2015); *see also United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) ("For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of [the charged] activity is to cause harm inside the United States or to U.S. citizens or interests" (internal quotation marks and citations omitted)).

**C.     The Alleged Immigration Fraud Occurred Outside of the Southern District of New York**

The indictment also charges Mr. Brennerman with visa fraud, alleging that he fraudulently obtained a visa through conduct "in the Southern District of New York and elsewhere."  (Ind. ¶ 17.)  Like many of the other allegations in the indictment, and Mr. Ellard's affidavit, this allegation is incorrect.  At no point did any conduct that would support the visa fraud charge occur in the Southern District of New York.

The Second Circuit has held that venue is proper in visa fraud cases where an "essential conduct element[] occurred in the Southern District of New York."  *United States v. Ramirez*, 420 F.3d 134, 140 (2d Cir. 2005) (internal quotations and citation omitted).  Significantly, the *Ramirez* Court disagreed with the government's position that venue could be established by ministerial review acts that occurred in New York; instead, the Court found that such acts were preparatory and not part of the offense.  *Id.* at 141-42.  Venue was proper, according to the *Ramirez* Court, where the defendant filed the visa application.  *Id.*

---

[6]  That the case should not be prosecuted in this jurisdiction is supported by the fact that ICBC London has refused to accept service of a subpoena or produce documents.  Defendant may have no ability to obtain the bank's own internal records regarding the underwriting and loan.

Here, nothing in the indictment demonstrates any connection between the alleged visa fraud and the Southern District of New York.  To the contrary, Mr. Brennerman's visa application was filed in and processed by the INS office in Laguna Nigel, California.  *See* Waller Decl. Ex. 6 (letter from Nancy M. Vizer to the US Citizenship & Immigration Services California Service Center on behalf of Blacksands Pacific Group, Inc. and Raheem Jefferson Brennerman, dated November 27, 2015).  Venue over the visa fraud count is therefore improper in the Southern District of New York.

**POINT II**

**THE DEVICES SEIZED PURSUANT TO THE SEARCH WARRANT
SHOULD BE RETURNED AND THE SEIZED MATERIALS
SUPPRESSED OR NONRESPONSIVE MATERIAL RETURNED**

**A.     The Warrant Failed to Articulate Probable Cause for Seizure of Mr.
        Brennerman's Records**

The application for a search warrant in this case bespeaks a lack of any meaningful analysis or investigation of the assertions of fraud that were bandied about – but never even asserted – in a years-old civil lawsuit.  In the Civil Case, the lender, ICBC London, sued to enforce a bridge loan that it entered into after a lengthy discussion with Blacksands – a loan that expressly contemplated Blacksands' acquisition of certain oilfields.  When ICBC London ultimately reneged on its agreement to finance that acquisition, but still wanted to participate in the deal, it provided a bridge loan to Blacksands while it sought other financing for the acquisition.  For a variety of reasons, Blacksands was not able to obtain other financing and ultimately defaulted on the loan.  ICBC London sued to collect.

Those circumstances, which were rehashed by Mr. Ellard in the affidavit in support of the search warrant, do not provide probable cause to believe that *any* crime was committed.  To the contrary, the claims here appear to violate a cardinal rule in relation to white collar prosecution

9

that a failure to repay a loan does not and should not be recast as a crime; the civil remedies are the entirely appropriate means by which such issues are addressed.   The Ellard Affidavit tries – but fails – to assert that there were actionable misrepresentations made by Mr. Brennerman to ICBC London to procure the ICBC London loan; the only supposedly false statements discussed by Mr. Ellard were made months later. The Ellard Affidavit literally asserts that Mr. Brennerman sought *to open accounts* at two other financial institutions, JPMorgan Chase and Morgan Stanley – and so was proposing to deposit money or assets with them, *not* obtain loans from them.  Ellard Aff. ¶ 15.  The Ellard Affidavit ends up being tantamount to the plainly improper assertion that, since the government claims that Mr. Brennerman engaged in misrepresentations to ICBC London, it is entitled to seize all materials relating to any transactions in which he engaged.  That has never been and is not the way in which white collar matters are investigated, and the Ellard Affidavit failed to justify those portions of the warrant that extend beyond the ICBC London transaction.

There are, of course, some instances in which a failed loan may rise to the level of a criminal fraud, but the Ellard Affidavit is strikingly devoid of the allegations that would support that leap.  Mr. Ellard fails to put forth any particularized claims of false statements in relation to Mr. Brennerman's proposal or application to ICBC London, citing only the accurate fact that Mr. Brennerman was seeking substantial amounts to fund the acquisition of actual oil fields.[7] Mr. Ellard then claims that statements were made by Mr. Brennerman – apparently oral representations not contained within any application or submission to the bank – but those are

---

[7]  Mr. Ellard also acknowledges that Mr. Brennerman was communicating with the owner of the fields regarding his interest in acquiring the fields.  *See* Ellard Aff. ¶ 19(e).  While Mr. Ellard offers a selective version of those discussions, it is at least beyond dispute that Mr. Brennerman was attempting to make exactly the purchase that he outlined to ICBC London, and there is no claim that he would not have been able to complete the purchase had he obtained the financing.

made six months after the transaction and so by definition did not induce the loan.  *See* Ellard Aff. ¶ 16(h).

Where a fraud has actually occurred, it is not that difficult or complex to set forth probable cause to believe that a fraud has been committed.  It requires analysis of the specific information submitted to the lender in support of the loan, consideration of the materiality of those representations and the extent of the lender's reliance, and the demonstrable falsity of those claims.  That is precisely what was not done by Mr. Ellard.

The Ellard Affidavit, and the sweeping search warrant that it purports to support, suffer from the same critical deficiencies that led to the suppression of materials in *United States v. Wey*, No. 15-cr-611(AJN), 2017 U.S. Dist. LEXIS 91138 (S.D.N.Y. June 13, 2017) (Nathan, J.). In *Wey*, as in this case, the affidavit in support of the warrant claimed that there was an overarching "scheme," and described the alleged components and tactics of the scheme.  *Id*. at *9.  As emphasized by the court, the affidavit focused on "a handful of specific companies" and included a list of the names of entities and individuals that were alleged involved in the schemes. *Id*. at *7.

The affidavit in *Wey* then sought authorization to seize "twelve expansive categories of materials set forth on an appended exhibit, with the limitation that the materials concern at least one of an independently appended list of approximately 220 named individuals and believed to be in some way connected to Wey's purported scheme."  *Id*. at *11.  The court emphasized the enormous scope of those "nonexhaustive lists" in each category – document requests that are substantially the same as those that were employed by the government against Mr. Brennerman. The warrant, the court concluded, would have "authorized the seizure [] of, for example, all "financial records," "internal and external communications," "correspondence," and other things

concerning the business.  Further, the court emphasized, the warrant "did not set out any date ranges or other time-based criteria."  *Id*. at *19.

Another search warrant contained similarly sweeping authorization for seizure from the Weys' apartment.  *Id*. at *21.

The court in *Wey*, in granting the defendant's motion to suppress all seized material, began by underscoring the critical purpose of the interwoven requirements of probable cause and particularity.

> To prevent such general exploratory rummaging in a person's belongings and the attendant privacy violations, the Fourth Amendment provides that a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity.  The particularity requirement is necessarily tied to the … probable cause requirement. That is because by limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches that the Framers intended to prohibit.

*Id*. at *59 (internal quotations and citations omitted).

As succinctly stated in *Wey*, the warrant must satisfy three criteria: first, it must "'identify the specific offense for which the police have established probable cause'"; second, it must "describe the place to be searched"; and third, it must "'specify the items to be seized by their relation to designated crimes.'"  *Id*. at *60 (citation omitted).  The *Wey* court emphasized also that, while the identification of specific offenses is one of the requirements, the identification of alleged offenses *does not* also satisfy the third requirement of specific description of the items to be seized.  As confirmed in numerous cases, it is not sufficient to use language authorizing seizure of documents "'relating to [the] previously described crime'" because that "'gave no limitation whatsoever on the kind of evidence sought.'"  *Id*. at *61 (citation omitted); s*ee also United States v. Galpin*, 720 F.3d 436, 445 n.5 (2d Cir. 2013) (courts have held that warrants that

identify "catch-all statutory provisions, like the mail fraud or conspiracy statutes, may fail to comply with" the particularization requirement).

Given the breadth of the various categories of documents listed in the search warrant in *Wey*, the court "ha[d] little difficulty concluding that [the warrants] fail to describe the items to be seized with the requisite particularity." 2017 U.S. Dist. LEXIS 91138, at *68. The Court initially focused on the fact that the warrants did not recite the alleged crimes, a significant defect in and of itself. *Id*. at *69-72. The court went on to reject the government's argument that there was no requirement to identify the crimes because the warrant otherwise described the categories of items to be seized with particularity. Holding that the items in the warrant "are by no means 'otherwise described with particularity,'" the court looked to the "expansive categories of often generic items subject to seizure – several of a 'catch-all' variety – without, crucially, any linkage to the suspected criminal activity, or indeed any content-based parameter of other limiting principle." *Id*. at *72; *see also id.* at *77 (collecting cases in which "courts in this Circuit have concluded that similarly expansive categories of documents rendered warrants constitutionally deficient"). The court noted that the warrant authorized seizure of "capacious buckets" of material: "'financial records,' 'notes,' memoranda,' records of 'communications,' 'correspondence,'" etc. *Id*. at *74-75. The court acknowledged that, in the warrants at issue in *Wey*, there was at least a limitation by virtue of the proviso that the documents had to "concern" or "relate to" at least one of the entities on an attached list, but the list included Wey himself as well as his company and still authorized seizure of a seemingly unlimited volume of documents.

Because of the "circular structure" and generic descriptions in the warrant, it lacked "any practical tool to guide the searching agents in distinguishing meaningfully between materials of

potential evidentiary value and those obviously devoid of it; the Warrants are – in function if not in form – general warrants." *Id.* at *75.

In addition, the *Wey* court held that the warrants were, in any event, overbroad by virtue of their failure "to limit the items subject to seizure by reference to any relevant timeframe or dates of interest." *Id.* at *77-78 (collecting cases).

> Many courts, for example, have found warrants for the seizure of [business] records constitutionally deficient where they imposed too wide a time frame or failed to include one altogether.'

*Id.* (collecting cases) (citation omitted).  That absence of a time frame "reinforces the Court's conclusion that the warrants are insufficiently particularized." *Id.* at *78 (citation omitted).

The failures of the warrant in *Wey*, as in this case, was "exacerbated by the fact that the Warrants target, in significant measure, the contents of electronic devices, such as computers, internal and external hard drives, and smartphones." *Id.* at *76.

> As the Court of Appeals observed just days ago, especially given the practical risk that 'every warrant for electronic information will become, in effect, a general warrant,' a warrant that 'lack[s] meaningful parameters on an otherwise limitless search of a defendant's electronic media' – including in its 'fail[ure] to link the evidence sought to the criminal activity supported by probable cause' – does not satisfy the particularity requirement.

*Id.* (citing *United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017)).

During the past decade, courts have become increasingly concerned about ensuring that the government's ability to seize entire computers for off-site examination does not "become a vehicle" for a plainly unconstitutional "general" search.

> We recognize the reality that over-seizing is an inherent part of the electronic search process and proceed on the assumption that, when it comes to seizure of electronic records, this will be far more common than in the days of paper records.  This calls for greater vigilance on the part of judicial officers in striking the right balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures.  The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect.

*United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010).

The "overseizing" that will accompany seizure of a hard drive will often include not only

irrelevant material but also personal non-seizable data.

> There is no question that computers are capable of storing immense amounts of
> information and often contain a great deal of private information.  Searches of computers
> therefore often involve a degree of intrusiveness much greater in quantity, if not different
> in kind, from searches of other containers.

*United States v. Abdellatif*, 758 F. Supp. 2d 183 (W.D.N.Y. 2010), *adopted by, motion granted*

*by, in part, motion denied by, in part,* 758 F. Supp. 2d 183 (W.D.N.Y. 2010).

> 'The dawn of the Information Age has only heightened those [privacy] concerns. The risk
> of exposing intimate (and innocent) correspondence to prying eyes is magnified because
> '[c]omputers … often contain significant intermingling of relevant documents with
> documents that the government has no probable cause to seize.'

*United States v. Cioffi*, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009) (citation omitted).

Where warrants authorize the seizure of electronic materials, '"the particularity

requirement assumes even greater importance.'"  *Wey*, 2017 U.S. Dist. LEXIS 91183, at *65-66

(quoting *Galpin*, 720 F.3d at 446).  That is because the 'seizure of a computer hard drive, and its

subsequent retention by the government, can give the government possession of a vast trove of

personal information about the person to whom the drive belongs, much of which may be

entirely irrelevant to the criminal investigation that led to the seizure.  As such, 'the potential for

privacy violations occasioned by an unbridled, exploratory search of a hard drive is enormous' –

'a threat that is compounded by the nature of digital storage.'"[8]  *Id*. (quoting *Galpin*, 720 F.3d at

447).

---

[8] Even the Department of Justice ("DOJ") in its own publications has acknowledged the difficult issues arising from
the overseizure inherent in any seizure of electronic devices.  In discussing search warrants for electronic
information, DOJ candidly acknowledges that computers "perform many functions" for its users, and "almost every
hard drive encountered by law enforcement will contain records that have nothing to do with the investigation."  *See
Department of Justice Computer Crime Manual Searching and Seizing Computers and Obtaining Electronic
Evidence in Criminal Investigations.*

These arguments apply with even greater force to any seizure of email accounts. The validity of a warrant for personal email accounts depends, first, on whether the affidavit in support of the warrant sufficiently established the use of that email account in connection with and/or as an instrumentality of the alleged offense. *United States v. Bowen*, 689 F. Supp. 2d 675, 682 (S.D.N.Y. 2010). Where, however, the affidavits fail to establish the use of the email account, or do not limit the seizure to emails related to the alleged crime, the seized materials should be suppressed. *Cioffi*, 668 F. Supp. 2d at 396. Importantly, suppression was ordered in *Cioffi* even though the warrant was much more tailored and narrow than the one in this case. The warrant in *Cioffi* sought emails for only a 10 month period and, as here, authorized seizure only of those "messages and content constituting evidence of violations of federal criminal law." 668 F. Supp. 2d at 388 (internal quotations and citation omitted). Those limitations were not sufficient to avoid suppression.

Here, the government presented information far thinner than existed in *Wey*, to seize an even more expansive volume of materials. The government's claims in this case involve particular areas of alleged misconduct in relation to the ICBC London loan. *See generally* Ex. 1. But the government did not limit seizures to emails relating to ICBC London. *See generally* Ex. 2. Even assuming that the affidavit in this case was sufficient to seize documents relating to the ICBC London transaction, it failed to offer even a claim of any other fraud and so failed to support the breadth of the search warrant. *Id.*

This deficiency of a seizure exceeding probable cause, the court explained in *Wey*, constitutes a "conceptually distinct" infirmity of the warrant.

> '[B]readth and particularity are related but distinct concepts.' The former issue is 'whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause' and the second is 'whether the warrant was sufficiently

particularized on its face to provide the necessary guidelines for the search by the executing officers.'

2017 U.S. Dist. LEXIS 91138, at *93 (citations omitted); *see also id.* at *65 ("'a warrant is overbroad if its 'description of the objects to be seized … is broader than can be justified by the probable cause on which the warrant is based.'" (citation omitted)).  Where the authorization to seize "exceeds the scope of the probable cause showing," it is an "independent (if related) overbreadth problem."  *Id.* at *94.

Moreover, the government has failed to demonstrate that the defendant's entire business is a fraud so the government, which would be the only justification seize all of his business documents.  And any argument that the warrant actually articulates probable cause relating to conduct beyond the ICBC London transaction on the allegation that Mr. Brennerman "sought financing from other banks," *see* Ellard Aff. ¶ 15, is belied by the additional allegation that Mr. Brennerman tried *to open* accounts at other banks to deposit funds.  *Id.*  The Ellard Affidavit does not state that he, at any time, applied for or sought financing from those banks.  The affiant appears to suggest that he might have opened the accounts so that at some point he *could* try to obtain financing.  That is mere speculation and fails to support a warrant authorizing seizure of all of his business records.

This Court is, therefore, confronted with a circumstance where the Ellard Affidavit supports – at most – a narrow category of documents relating to the ICBC London transaction. The warrant does not correspond to those allegations but rather authorizes seizure of any and all of Mr. Brennerman's transactions and all documents related to Blacksands—without regard to their date—from his home.  Not only *Wey*, but a substantial line of cases that are referenced in *Wey*, make clear that the warrant far outstrips the contents of its application, and the documents must therefore be suppressed.  2017 U.S. Dist. LEXIS 91138, at *58-79.

17

**B.      The Government's Execution of the Warrants was Unconstitutional**

Where the government engages in an indiscriminate seizure of materials that are beyond the scope of a warrant, and then retains those materials, suppression is the appropriate remedy. In *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), for example, agents seized and retained volumes of documents without ensuring that they were within the scope of the warrant. The court held that the government's retention of the documents for six months may have been "convenient," but was "an unreasonable and therefore unconstitutional manner of executing the warrant." *Id*. at 597; *see also United States v. Soliman*, No. 06-cr-236, 2008 U.S. Dist. LEXIS 87304, at *1 (W.D.N.Y. Oct. 29, 2008) (ordering that "items outside of the scope of the search warrant should be identified and returned to defendant"); *United States v. Squillacote*, 221 F.3d 542, 556 (4th Cir. 2000) (as a general rule, when the seizure exceeds the scope of the warrant, the improperly seized evidence must be suppressed); *United States v. Criminal Triumph Capital Grp.*, 211 F.R.D. 31, 60 (D. Conn. 2002); *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000).

While the government may respond by focusing on its ability to *initially* seize entire computer hard drives, that would be a dramatic distortion of the nature of that authorization. That authorization arose from judicial and legislative efforts to allow the government a reasonable opportunity ***to search data*** so as to comply with the scope of the warrant; it is not authorization to ignore the scope of the warrant.[9]  *See United States v. Grimmett*, 439 F.3d 1263, 1269 (10th Cir. 2000)(warrant authorized seizure of computer and then off site search); *United States v. Upham,* 168 F.3d 532, 535 (1st Cir. 1999) (warrant authorized seizure of computer and the subsequent off premises search); s*ee also* Fed. R. Crim. P. 41(e)(2)(B) Commentary (rule

---

[9]   The cases also discuss at length the procedures that are permissible in connection with the search of the hard drive.  *See United States v. Kernell*, No. 3:08-cr-142, 2010 U.S. Dist. LEXIS 32845, at *35-36 (E.D. Tenn. Mar. 31, 2010), *Report and Recommendation adopted by*, 2010 U.S. Dist. LEXIS 36292 (E.D. Tenn. Apr. 13, 2010) (discussing permissibility of search procedures including areas that could be searched and search terms).

acknowledges need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant).  And "[t]he court must also consider whether the government's subsequent search of [defendant's] computers that it imaged during the execution of the search warrant passes constitutional scrutiny."  *United States v. Dupree*, 781 F. Supp. 2d 115, 152 (E.D.N.Y. 2011), *motion granted by, in part, motion denied by, in part*, 2011 U.S. Dist. LEXIS 55159 (E.D.N.Y. May 23, 2011); s*ee Criminal Triumph Capital Grp.*, 211 F.R.D. at 62; *United States v. Mutschelknaus*, 564 F. Supp. 2d 1072, 1077 (D. N.D. 2008), *aff'd*, 592 F.3d 826 (8th Cir. 2010).

While this jurisdiction and others have not yet required that search protocols be incorporated into the warrant, the courts have emphasized that they will scrutinize the treatment of "overseized" data to ensure that the government has performed searches designed to ensure compliance with a particularized warrant.  *See United States v. Graziano*, 558 F. Supp. 2d 304, 315 (E.D.N.Y. 2008) ("[A]lthough the Second Circuit has not decided this precise issue, this Court declines to adopt a rule that would invalidate search warrants which do not contain a specific methodology explaining how the computers would be searched."), *aff'd*, 2010 U.S. App. LEXIS 18768 (2d Cir. Sept. 7, 2010).

> The Court emphasizes, however, that the rejection of the blanket rule [requiring search protocols] does not give law enforcement a license to turn every search of a computer into a general search; rather, there are Fourth Amendment limits to every search that apply with equal force to searches of computers. Thus, although courts are ill-suited to mircomanage in advance how the computer will be searched, law enforcement must establish the basis for searching the computer and particularize the evidence being sought.

*Graziano*, 558 F. Supp. 2d at 316.

Plainly, in this case, the government not only "overseized" but did so in dramatic fashion, taking every computer and hard drive that it could find, imaging them, but then declining to return the actual devices or the plainly substantial quantity of nonresponsive data.  The

government should be required to, within a reasonable time frame, process the warrant materials and divest itself of that which it had no right to seize in the first place.

Nevertheless, the government has claimed that it is entitled to seize all of Mr. Brennerman's Blacksands-related documents. But it has to concede that it seized enormous quantities of information that are personal or otherwise irrelevant. By way of example, the government seized Mr. Brennerman's personal email communications, including communications between Mr. Brennerman and a woman with whom he was involved. According to the government's own representations to that individual, the prosecutors are reviewing and using those emails even though, as they confirmed to her, they know that she had nothing to do with his business. This is the insidious nature of overseizure that is becoming increasingly problematic in this electronic age: having obtained the authorization to take entire electronic devices, the government then feels entitled to review, use and keep them.

Significantly, the government has previously asserted that it has actually completed an appropriate review of all electronic devices to identify that which is responsive to its warrant. It is therefore, at the least, incumbent on the government to divest itself of that which is not responsive, *e.g.*, Mr. Brennerman's personal communications. Those materials should have been returned to the defendant or an agreement made to destroy them.

## POINT III

### THE COURT SHOULD ORDER THE GOVERNMENT TO IMMEDIATELY DISCLOSE RULE 404(B) EVIDENCE

Mr. Brennerman requests that the Court compel the government to immediately provide him with notice of any Rule 404(b) evidence the government intends to introduce at trial. Federal Rule of Evidence 404(b) requires the government to provide a criminally accused with

reasonable notice of other crimes, wrongs, or acts it intends to introduce at trial.  Specifically,

Rule 404(b) provides as follows:

> *(1) Prohibited Uses.*  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> *(2) Permitted Uses; Notice in a Criminal Case.*  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  On request by a defendant in a criminal case, the prosecutor must:

>> *(A)*  provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

>> *(B)* do so before trial - or during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b) (emphasis added). The pretrial notice requirement of Rule 404(b),

highlighted above was added as part of the 1991 amendments, and "is intended to reduce surprise

and promote early resolution on the issue of admissibility."  *Id.* (Committee Notes to 1991

Amendments).  Moreover, "[t]he amendment requires the prosecution to provide notice,

regardless of how it intends to use the extrinsic act evidence at trial, i.e., during its case-in-chief,

for impeachment, or for possible rebuttal."  *Id.*  Finally, the notice provided by the government

must "fairly apprise" the defendant of the general nature of the evidence to be introduced, and be

sufficiently clear as to permit pretrial resolution of any admissibility issues.  *United States v.

Barnes*, 49 F.3d 1144, 1148-49 (6th Cir. 1995).

Here, the need for disclosure is particularly pressing.  Mr. Brennerman's trial is set to

commence in approximately 60 days.  The allegations in the indictment are vague and it is

unclear at this juncture what specific conduct or transactions the government is alleging aside

from the ICBC London transaction.  For example, during defendants' bail application, the

government alleged that Mr. Brennerman was communicating with one of his victims while out

on bond.  Yet it is unclear whether that alleged conduct is being charged by the government in the indictment, whether it intends to offer such evidence under Rule 404(b), or whether that alleged conduct will not be introduced at trial for any purpose.  The indictment simply lacks any specific details regarding what conduct the grand jury actually considered and found to be criminal.  Hence, it is not entirely clear what acts the government will attempt to show are encompassed by the indictment and which are uncharged and subject to Rule 404(b). Furthermore, with regard to Mr. Brennerman's allegedly fraudulent conduct, the indictment suggests that there are others acts not referenced in its vague allegations by referencing various financial institutions without specific allegation of fraud.  Accordingly, the identification of the specific "other acts" upon which the government intends to rely upon is required for Mr. Brennerman to prepare his defense, to avoid surprise at trial, and to permit the early resolution of any disputes regarding the admissibility of such evidence.  *See United States v. Livoti*, 8 F. Supp. 2d 246, 250 (S.D.N.Y. 1998) (Scheindlin, J.) (directing government to give defendant more than one-month's notice of Rule 404(b) evidence "given the absence of any threat to the safety of prospective witnesses and the apparent importance of Rule 404(b) evidence in this action"); *United States v. Heatley*, 994 F. Supp. 483, 491 (S.D.N.Y. 1998) (Sotomayor, J. ) (directing government to provide defendant with Rule 404(b) materials at least three weeks prior to trial); *United States v. Caruso*, 948 F. Supp. 382, 395-96 (D.N.J. 1996) (directing disclosure of Rule 404(b) materials at least 30 days before trial).

For these reasons, Mr. Brennerman respectfully requests that the Court order the government to comply with its obligation to provide the defendant with reasonable notice of any Rule 404(b) evidence the government intends to introduce at trial. Specifically, Mr. Brennerman requests that such material be immediately provided to him.

## <u>CONCLUSION</u>

For the foregoing reasons, defendant's motions should be granted in their entirety.

Dated: New York, New York
      September 19, 2017

Respectfully submitted,

 /s/Brian D. Waller
Maranda Fritz (MF 8060)
Brian D. Waller (BW 7163)
THOMPSON HINE LLP
335 Madison Avenue
New York, NY 10017
(212) 344-5680
maranda.fritz@thompsonhine.com
brian.waller@thompsonhine.com

*Counsel for Defendant Raheem Brennerman*

23